IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JOSHUA M.,

                Plaintiff,

     vs.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,

                Defendant.

**4:22-CV-03266**

**MEMORANDUM AND ORDER ON
JUDICIAL REVIEW OF
COMMISSIONER'S DENIAL OF
BENEFITS**

Plaintiff Joshua M.[1] seeks judicial review of the denial of his application for supplemental security income benefits by defendant Commissioner of the Social Security Administration. Filing 1. Joshua M. has moved for an order reversing the Commissioner's decision. Filing 13. In response, the Commissioner filed a motion to affirm the Commissioner's final decision denying supplemental security income benefits. Filing 14. For the following reasons, the Court grants the Commissioner's motion to affirm and denies Joshua M.'s motion to reverse.

## I.  INTRODUCTION

### A.  Procedural Background

Joshua M. made a protective filing for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*, on February 13, 2020, in which he alleged disability with an onset date of January 1, 2011. Filing 11-2 at 14 (Administrative Record (AR) 13). Joshua M.'s application was initially denied by the Social Security Administration (SSA) on October 16, 2020. Filing 11-2 at 14 (AR 13). Upon reconsideration, Joshua M.'s application was again denied by the SSA on March 24, 2021. Filing 11-2 at 14 (AR 13).

---

[1] The Court will refer to Plaintiff by first name and last initial to protect his privacy.

Following both denials of his application for supplemental security income benefits, Joshua M. requested a hearing pursuant to 20 C.F.R. § 416.1429, and the administrative law judge (ALJ) held a hearing to review Joshua M.'s application on November 24, 2021. Filing 11-2 at 14 (AR 13). The administrative hearing was held over the telephone in light of the COVID-19 Pandemic. Filing 11-2 at 14 (AR 13). Prior to the hearing, Joshua M. amended the alleged disability onset date to February 13, 2020, the date he protectively filed his application for supplemental security income benefits. Filing 11-2 at 14 (AR 13); *see also* Filing 11-5 at 20 (AR 190). On December 14, 2021, the ALJ issued a ruling in favor of the Commissioner, denying Joshua M.'s claim for supplemental security income benefits. Filing 11-2 at 26 (AR 25). Joshua M. requested a review of the ALJ's decision by the Appeals Council, which found no reason to reverse the ALJ's decision. Filing 11-2 at 2 (AR 1). Thereafter, Joshua M. timely filed this action seeking judicial review of the ALJ's ruling by this Court. Filing 1.

**B. Factual Background**

*1. The Claimant and His Alleged Disabilities*

On the amended alleged onset date of disability of February 13, 2020, Joshua M. was twenty-four years old, which is defined as a younger individual under 20 C.F.R. § 416.963(c) (designating a younger person as one who is "under age 50"). Filing 11-2 at 25 (AR 24). Joshua M. was twenty-six years old at the time of his administrative hearing on November 24, 2021. Joshua M. has a high school education, which places him in the fourth classification of educational ability, defined at 20 C.F.R. § 416.964(b)(4). Filing 11-2 at 25 (AR 24). Joshua M.'s only relevant work since the amended alleged onset date of February 13, 2020, was his part-time employment at Jimmy John's, which lasted from March or April 2020 until early 2021. Filing 11-2 at 16 (AR 15); Filing 11-5 at 16 (AR 186); Filing 11-6 at 29 (AR 219). However, in light of Joshua M.'s low quarterly earnings, the ALJ determined that Joshua M.'s part-time employment at Jimmy John's

2

did not qualify as substantial gainful activity under 20 C.F.R. § 416.971 *et seq.* Filing 11-2 at 16 (AR 15); Filing 11-5 at 16 (AR 186); Filing 11-6 at 29 (AR 219). In his disability report, Joshua M. alleged that he has narcolepsy with cataplexy,[2] severe anxiety, and severe depression. Filing 11-6 at 6 (AR 196). Joshua M. also has a history of substance abuse with both alcohol and drugs but was sober and showed signs of improvement in this area at the time of the SSA's disability determination on October 16, 2020. Filing 11-3 at 4–5 (AR 63–64).

In support of his motion to reverse, Joshua M. first maintains that the ALJ erred in determining that the opinion of Dr. Dewan, one of Joshua M.'s treating physicians, was not persuasive with respect to the severity of Joshua M.'s mental impairments. Filing 13-1 at 13–14. Secondly, Joshua M. argues that the ALJ's findings regarding Joshua M.'s subjective complaints are not based on substantial evidence in the record. Filing 13-1 at 15–19. In particular, Joshua M. contends that the ALJ failed to consider the type, dosage, and effectiveness of his medication, Joshua M.'s testimony, Dr. Dewan's medical source statement, lay witness statements, and other medical evidence when rendering the administrative decision. Filing 13-1 at 15.

### 2. *Medical Records and Evidence*
#### a.   Treating Providers' Opinions of Joshua M.'s Symptoms

On April 27, 2019, Joshua M. was admitted to Keystone Treatment Center, an addiction rehabilitation facility in Canton, South Dakota.[3] Filing 11-7 at 22, 29 (AR 312, 319). During his

---

[2] Narcolepsy is defined as "[r]ecurrent periods of an irrepressible need to sleep, lapsing into sleep, or napping occurring within the same day. These must have been occurring at least three times per week over the last 3 months." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* at 372 (5th ed. 2013). Additionally, the DSM-5 states that narcolepsy may be accompanied by cataplexy, which is defined as either: "(a) In individuals with long-standing disease, brief (seconds to minutes) episodes of sudden bilateral loss of muscle tone with maintained consciousness that are precipitated by laughter or joking, [or] (b) In children or in individuals within 6 months of onset, spontaneous grimaces or jaw-opening episodes with tongue thrusting or a global hypnotia, without any obvious emotional triggers." *Id.* at 372–73.

[3] The record indicates that Joshua M. was admitted to Keystone Treatment Center pursuant to a court order that stemmed from felony charges for "possession of multiple substances" and gun possession. Filing 11-7 at 35 (AR 325). Additionally, the record states that Joshua M. had a history of substance abuse with alcohol, marijuana, and cocaine,

stay at Keystone Treatment Center, Joshua M. completed a psychiatric evaluation with Michael Moeller, M.D., on May 6, 2019. Filing 11-7 at 32–33 (AR 322–23). In the psychiatric evaluation report, Dr. Moeller noted Joshua M.'s history of narcolepsy. Filing 11-7 at 32 (AR 322). Specifically, Dr. Moeller noted that Joshua M. had been treated with Provigil (modafinil) for his narcolepsy, but that he discontinued use of the medication because it caused him to exhibit excessive sweating. Filing 11-7 at 32 (AR 322). Dr. Moeller further specified that "[Joshua M.] is not on any medicine for the narcolepsy and he is not looking for any kind of treatment for that." Filing 11-7 at 33 (AR 323). Pertaining to Joshua M.'s alleged mental disabilities of anxiety and depression, Dr. Moeller noted "[Joshua M.] does not endorse any significant psychiatric symptoms for depression or anxiety." Filing 11-7 at 32 (AR 322).

Following his stay at Keystone Treatment Center, Joshua M. sought treatment from different professionals for his physical and mental impairments. On June 4, 2019, Joshua M. began seeing Naresh Dewan, M.D., a doctor who specializes in sleep medicine, to obtain treatment for his physical impairments. Filing 11-7 at 50–54 (AR 340–44). On July 3, 2019, Joshua M. began meeting with Molly Petersen, an APRN with Collaborative Psych Practitioners, to discuss his mental impairments. Filing 11-7 at 90 (AR 380). Joshua M. continued to see Dr. Dewan and Ms. Petersen several times between 2019 and 2021. In order to avoid an unnecessarily lengthy narrative summarization of each appointment, the Court finds it easier to present this portion of the medical evidence in the form of a table, set out below. Within this table, the Court will use the abbreviation "JM" to refer to the plaintiff, "ND" to refer to Dr. Dewan, and "MP" to refer to Ms. Petersen.

---

inter alia, prior to his admission to Keystone Treatment Center on April 27, 2019. Filing 11-7 at 34–35 (AR 324–25). At the time of the administrative hearing, the ALJ noted that Joshua M.'s substance abuse disorder was not severe because it did not cause more than minimal limitation on his ability to perform basic mental work activities. Filing 11-2 at 16–17 (AR 15–16). Joshua M. did not contest the ALJ's findings regarding his substance abuse disorder. *See generally* Filing 13-1 at 1–20. Joshua M. was discharged from Keystone Treatment Center on May 17, 2019. Filing 11-7 at 22 (AR 312).

Unless specifically noted otherwise, all rankings are generated by the pertinent provider for each appointment in the table.

| Date of Visit | Sleepiness/Sleep Hygiene (Epworth Sleepiness Score, (ESS) greater than 10 is considered excessive daytime sleepiness) | Anxiety (ranked from 1–10, with 10 being most anxious) | Depression/Mood (ranked from 1–10, with 10 being best mood) | Substance Use | Medications/Other Notes |
|---|---|---|---|---|---|
| 06/04/2019 (ND) | ESS ranked at 15. Filing 11-7 at 53–54 (AR 343–44). | | | | Provigil (modafinil) 100 mg prescribed to be taken once daily to curtail narcolepsy symptoms. Filing 11-7 at 51, 54 (AR 341, 344). |
| 07/03/2019 (MP) | JM reported getting 12 to 18 hours of sleep daily, comprised of 1–2-hour blocks of sleep, followed by periods awake of unspecified length. Filing 11-7 at 90 (AR 380). | Anxiety ranked between level 7 and 8. MP noted several symptoms of anxiety. Filing 11-7 at 90, 92 (AR 380, 382). | Mood ranked at 6 out of 10. MP noted some symptoms of depression. Filing 11-7 at 90, 92 (AR 380, 382). | MP noted JM's history of substance abuse. See Filing 11-7 at 91 (AR 381). | |
| 08/13/2019 (ND) | ESS ranked at 13. JM reported average bedtime between 12 AM and 2 AM with average wake time of 9 AM. JM advised to get to bed earlier. JM advised to use extreme caution while driving and not to drive when he feels sleepy. Filing 11-7 at 55–56, 59 (AR 345–46, 349). | | ND noted JM's use of fluoxetine (Prozac) but did not make any other references to depression symptoms. Filing 11-7 at 56 (AR 346). | | JM tolerated the Provigil tablets well, so ND increased dosage to 200 mg, once daily. Filing 11-7 at 59 (AR 349). Prozac was prescribed to JM by his primary care physician. Filing 11-7 at 56 (AR 346). |
| 09/04/2019 (MP) | JM reported that his sleep was the same at night, where he would sleep "for a couple hours," followed by 30-minute periods being awake. Filing 11-7 at 85 (AR 375). | Anxiety ranked at level 4. JM reported that he was doing well, and that he "doesn't have much anxiety any more [sic]." Filing 11-7 at 85–86 (AR 375–76). | Mood ranked between level 5 and 6. JM reported not getting depressed any longer at nighttime. Filing 11-7 at 85–86 (AR 375–76). | JM reported being sober for five months. Filing 11-7 at 85 (AR 375). | MP noted that JM had continued Provigil (modafinil) and he denied any side effects from his medications. MP noted that JM's conditions were improving. Filing 11-7 at 85, 88 (AR 375, 378). |

| 12/13/2019 (ND) | ESS ranked at 15. JM reported cataplexy while laughing, but said these episodes were "not very frequent." Filing 11-7 at 60, 62 (AR 350, 352). | | | | JM took first dose of Provigil at 9 AM, and ND noted that this medication "has improved [JM's] daytime function significantly until about 1 PM." ND stated that JM's cataplexy symptoms "reduced significantly with Provigil. Filing 11-7 at 60 (AR 350). |
|---|---|---|---|---|---|
| 02/05/2020 (MP) | MP noted "[JM] states his sleep is not good. He is sleeping all the time. . . . he is sleeping for 16–20 hours a day." Filing 11-7 at 83 (AR 372). | Anxiety was not ranked. "[JM] states his anxiety is ok. He states he is not worrying about what others think. He worries about his health a lot." Filing 11-7 at 82 (AR 372). | Mood was not ranked. "[JM] states his mood has been good. He states he has been feeling lower. . . . He has feelings of worthlessness." JM reported having "thoughts of 'it would be easier if I wasn't alive'" MP noted that "[JM] denies any intent or plans to hurt himself." Filing 11-7 at 82 (AR 372). | JM had been sober for approximately ten months. Filing 11-7 at 82 (AR 372). | |
| 03/04/2020 (MP) | JM reported that he was "sleeping 18 hours a day at times." Filing 11-7 at 102 (AR 392). | Anxiety ranked at level 2. JM reported that he was about to spend three days in jail for missing a probation meeting. JM was ultimately not required to serve jail time. Filing 11-7 at 95, 102, 121 (AR 385, 392, 411). | Mood ranked at level 8. Filing 11-7 at 95 (AR 385). | JM denied any cravings for drugs, and reported being almost eleven months sober from alcohol use. Filing 11-7 at 102 (AR 392). | JM's primary care physician had increased Prozac to 40 mg daily, and JM found this to be helping his mood. MP noted that ND had increased JM's Provigil dose to 400 mg per day. MP noted that JM's conditions were "improving." Filing 11-7 at 95, 102 (AR 385, 392). |
| 05/28/2020 (MP) | JM claimed his sleep was "ok", and he reported getting 14 hours of "broken up sleep" each day. Filing 11-7 at 121 (AR 411). | Anxiety ranked at level 3. JM reported being anxious about going to work (part-time employment at Jimmy John's), but he denied having any panic attacks. Filing 11-7 at 121, 123 (AR 411, 413). | Mood ranked between level 7 and 8. MP noted JM's mood was good and that he denied any feelings of hopelessness or helplessness. Filing 11-7 at 121, 123 (AR 411, 413). | JM denied any drug or alcohol use during this visit. Filing 11-7 at 121 (AR 411). | |

| 06/08/2020 (ND) | * No progress notes from this visit with ND are included in the record. | | | | |
|---|---|---|---|---|---|
| 08/22/2020 (MP) | JM reported getting 8 hours of sleep each night while taking Xyrem. Filing 11-7 at 125 (AR 415). | Anxiety ranked at level 1. | Mood ranked at level 8. JM reported that his mood had been good, and he denied feeling depressed. Filing 11-7 at 125, 127 (AR 415, 417). | JM denied any drug or alcohol use, and he reported attending nine AA meetings each week. Filing 11-7 at 125 (AR 415). | JM continued Provigil and fluoxetine without any changes. JM was prescribed Xyrem to improve his daytime sleepiness and reduce his cataplexy symptoms by ND on June 8, 2020. Filing 11-7 at 125, 167 (AR 415, 457). |
| 09/30/2020 (MP) | JM reported that his sleep was "not great." JM reported the need to take a nap a few hours after each of his Provigil doses. JM claimed that his Xyrem did not work well and that his nighttime sleep was broken up. Filing 11-7 at 135 (AR 425). | Anxiety ranked at level 4. JM reported his anxiety as being "a little higher", but he denied having panic attacks. Filing 11-7 at 135, 137 (AR 425, 427). | Mood ranked at level 7. JM reported having a good mood, and said "he gets sad at times, but not depressed." Filing 11-7 at 135 (AR 425). | JM denied any drug or alcohol use, and continued to report that he was attending AA meetings each week. Filing 11-7 at 135 (AR 425). | Prior to this appointment, JM discontinued his use of fluoxetine (Prozac), and he did not report any difficulties in doing so. JM continued Provigil and Xyrem without any changes. Filing 11-7 at 135 (AR 425). |
| 12/17/2020 (ND) | ESS ranked at level 18. JM reported improved sleep. JM's average wake time was between 7 AM and 9 AM. ND reported that "[JM] feels his mind is clear after taking Xyrem." ND advised JM to practice going to bed consistently from 10 PM until 7 AM. Filing 11-7 at 166–167, 169, 176, 178 (AR 456–57, 469, 466, 468). | | | | JM told ND that he attended an AA meeting each night at 10 PM, following a 1 to 2 hour nap. ND told JM that he could take short naps during the day, if necessary. However, JM did not report needing to take daytime naps during this visit. Filing 11-7 at 167, 176 (AR 457, 466). |

| | | | | |
|---|---|---|---|---|
| 05/18/2021 (ND) | ESS ranked at level 16. JM reported sleeping from 10 PM or 11 PM until around 6:30 to 7 AM. JM reported quitting his job at Jimmy John's "as he was struggling to stay awake . . . and was not usually allowed to take brief naps there." JM reported improved nighttime sleep and less daytime sleepiness between his December 17, 2020 and May 18, 2021 appointments. Filing 11-7 at 171–73, 175, 180–82, 184 (AR 461–63, 465, 470–72, 474). | | | | JM stated that Provigil (modafinil) was beneficial, with the exception of "a few days a week [when] it seems as though he is more tired." ND noted that "[o]verall [JM] feels about the same if not better than at his previous appointment" and that "[JM] denies any cataplexy symptoms." Filing 11-7 at 172, 181 (AR 462, 471). |

On October 19, 2020, Joshua M.'s attorney sent a letter to Dr. Dewan asking him to complete a medical source statement form regarding his observations of Joshua M.'s alleged symptoms. Filing 11-7 at 105–06 (AR 395–96). Dr. Dewan completed and signed the medical source statement form on October 22, 2020, and sent a scanned copy of the completed form to Joshua M.'s attorney on November 6, 2020. Filing 11-7 at 107–110, 162–165 (AR 397–400, 452–455). In his medical source statement, Dr. Dewan noted that Joshua M. was taking Xyrem,[4] as well as 200 mg of Provigil (modafinil) twice a day to curtail his narcolepsy and cataplexy symptoms. Filing 11-7 at 107, 162 (AR 397, 452). Notwithstanding Joshua M.'s medication regimen, Dr. Dewan stated that "Patient [Joshua M.] is still very sleepy during the day as judged by ESS [Epworth Sleepiness Scale score] 17[.]" Filing 11-7 at 107, 162 (AR 397, 452).

Further in the medical source statement, in response to a question asking him to identify symptoms shown by the patient prior to a cataplexy spell, Dr. Dewan reported that Joshua M. experiences episodes of weakness and lightheadedness while laughing. Filing 11-7 at 107–08, 162–63 (AR 397–98, 452–53). Dr. Dewan then stated that Joshua M. experiences episodes of cataplexy two to three times per week, during which he sleeps for a few minutes. Filing 11-7 at 107, 162 (AR 397, 452). Additionally, Dr. Dewan identified four areas of limitation in Joshua M.'s ability to work as a result of his narcolepsy and cataplexy: (1) "Should avoid work involving climbing and heights"; (2) "Should avoid power machines, moving machinery or other hazardous conditions"; (3) "Should limit or avoid operation of motor vehicles"; and (4) Should avoid work which is not closely supervised where a spell could occur in isolation. Filing 11-7 at 108–09, 163–64 (AR 398–99, 453–54). Dr. Dewan also identified four activities that he believed Joshua M. had serious limitations performing on a sustained basis, namely: (1) "Understand, remember and carry

---

[4] Joshua M. was prescribed two 500 mg daily doses of Xyrem, which he took at midnight and 4 am, respectively. Filing 11-7 at 167–68 (AR 457–58).

out simple instructions"; (2) "Maintain attention for two-hour segments"; (3) "Perform at a consistent pace"; and (4) "Deal with normal work stresses." Filing 11-7 at 109, 164 (AR 399, 454). Dr. Dewan did not identify any additional limitations in the medical source statement that would affect Joshua M.'s ability to work.

   b. Self and Lay Assessments of Joshua M.'s Functionality

  Joshua M. completed a function report for use by the Social Security Administration in considering his application for supplemental security income on May 29, 2020. Filing 11-6 at 40–47 (AR 230–237). In his function report, Joshua M. claimed that he falls asleep while working and that he has difficulty staying awake while working. Filing 11-6 at 40 (AR 230). Additionally, Joshua M. reported that his "muscles start to shut down from cataplexy" while working. Filing 11-6 at 40 (AR 230). In describing how his conditions affect his ability to sleep, Joshua M. explained that he is always tired because of his narcolepsy. Filing 11-6 at 41 (AR 231). Joshua M. indicated that he has difficulty taking care of his personal needs and grooming because he is often "too tired to do it." Filing 11-6 at 42 (AR 232). Joshua M. also reported that he prepares his own meals once a day. Filing 11-6 at 42 (AR 232). Moreover, Joshua M. reported that he is able to do the laundry, because he sleeps between cycles of washing and drying. Filing 11-6 at 42 (AR 232). However, Joshua M. claimed that his narcolepsy prevents him from completing other house or yard work. Filing 11-6 at 43 (AR 233).

  Further in his function report, Joshua M. indicated that he goes out once a day, either driving himself, or as a passenger in a car. Filing 11-6 at 43 (AR 233). Joshua M. reported that he is only able to drive for 15 minutes by himself. Filing 11-6 at 43 (AR 233). Additionally, Joshua M. stated that he plays games for two hours total each day.[5] Filing 11-6 at 44 (AR 234). Joshua M.

---

[5] The record does not indicate whether Joshua M. was referring to video games or other types of games.

also reported that he attends one-hour-long AA meetings five days each week. Filing 11-6 at 44 (AR 234). Joshua M. further indicated that he does not need anyone to accompany him to these AA meetings. Filing 11-6 at 44 (AR 234). Joshua M. claimed that his conditions affect his memory, concentration, and his ability completing tasks. Filing 11-6 at 45 (AR 235). Joshua M. claimed that he always forgets things and that he is sometimes "too tired to complete tasks or understand what [he's] doing[.]" Filing 11-6 at 45 (AR 235). Lastly, Joshua M. reported that he can pay attention for 45 minutes at a time and that he follows written instructions "pretty well." Filing 11-6 at 45 (AR 235).

On December 8, 2020, Matt Anthony, a former coworker of Joshua M., wrote a statement regarding Joshua M.'s abilities. Filing 11-6 at 51 (AR 241). In this written statement, Mr. Anthony reported that Joshua M. would become "very sluggish" in completing tasks after a couple hours of working. Filing 11-6 at 51 (AR 241). Further in his statement, Mr. Anthony recalled an instance where he witnessed Joshua M. "basically pass out while making a sandwich" at work. Filing 11-6 at 51 (AR 241). In that instance, Mr. Anthony reported that he woke Joshua M. upon noticing that he was asleep. Filing 11-6 at 51 (AR 241). Mr. Anthony also reported that his managers had told him that Joshua M. is a better worker toward the beginning of the day, but that Joshua M. becomes "worse and worse" the longer he works. Filing 11-6 at 51 (AR 241). Mr. Anthony further stated that Joshua M. would usually get his work shifts covered whenever he was scheduled to work a longer shift to avoid falling asleep. Filing 11-6 at 51 (AR 241). Lastly, Mr. Anthony stated that Joshua M. was late to work most days. Filing 11-6 at 51 (AR 241).

c.   Evaluations of Joshua M.'s Medical History by State Consultants

On October 16, 2020, state consulting psychologist, Rebecca Braymen, Ph.D., found Joshua M.'s medically determinable mental impairments of depression, anxiety, and substance

abuse to be severe in nature, based on her review of the evidence. Filing 11-3 at 4 (AR 63). Dr. Braymen also concluded that Joshua M.'s medically determinable mental impairments did not precisely satisfy the criteria of their respective listings under 20 C.F.R. Pt. 404, Subpt. P, App. 1. Filing 11-3 at 4 (AR 63). Dr. Braymen noted that Joshua M. has mild mental limitations in adapting and managing himself, as well as in understanding, remembering, or applying information. Filing 11-3 at 4 (AR 63). Additionally, Dr. Braymen reported that Joshua M. has moderate mental limitations in interacting with others and in concentrating, persisting, or maintaining pace. Filing 11-3 at 4 (AR 63).

In determining Joshua M.'s mental residual functional capacity (RFC), Dr. Braymen noted that Joshua M. has moderate limitations in his ability to carry out detailed instructions and in his ability to maintain attention and concentration for extended periods. Filing 11-3 at 7 (AR 66). Dr. Braymen further opined that Joshua M. has moderate limitations in his ability to complete a normal workday and workweek and in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. Filing 11-3 at 7 (AR 66). In support of these findings, Dr. Braymen noted that Joshua M.'s depression and narcolepsy "would interfere with his abilities to stay on task for extended amounts of time." Filing 11-3 at 7 (AR 66). Lastly, Dr. Braymen noted that Joshua M. has moderate limitations in his ability to ask simple questions or request assistance and in his ability to accept instructions and respond appropriately to criticism from supervisors. Filing 11-3 at 7 (AR 66). Dr. Braymen cited Joshua M.'s history of isolative behavior and feelings of hopeless and helplessness in support of these findings. Filing 11-3 at 8 (AR 67).

On October 16, 2020, Richard Surrusco, M.D., state consulting physician, reviewed the evidence in this case and concluded that Joshua M.'s physical symptoms were severe but did not preclude all types of work. Filing 11-3 at 5, 8 (AR 64, 67). Dr. Surrusco concluded that Joshua

M.'s statements regarding his physical symptoms were partially consistent with all of the medical evidence of record. Filing 11-3 at 5 (AR 64). In determining Joshua M.'s physical RFC, Dr. Surrusco noted that Joshua M. has the ability to stand, sit, and/or walk with normal breaks for a total of approximately 6 hours in an 8-hour workday. Filing 11-3 at 6 (AR 65). Dr. Surrusco further opined that Joshua M. has postural limitations that preclude him from climbing ladders, ropes, and scaffolds. Filing 11-3 at 6 (AR 65). Moreover, Dr. Surrusco found that Joshua M. has environmental limitations that preclude him from working in environments with hazards such as machinery and heights. Filing 11-3 at 6 (AR 65). Dr. Surrusco cited Joshua M.'s narcolepsy and cataplexy as the reason for these environmental limitations. Filing 11-3 at 6 (AR 65). In light of the seven strength factors of the physical RFC, Dr. Surrusco concluded that Joshua M. has a light maximum sustained work capability. Filing 11-3 at 8 (AR 67). Dr. Surrusco concluded that Joshua M. is limited to unskilled work because of his impairments.[6] Filing 11-3 at 8 (AR 67). Accordingly, Dr. Surrusco determined that Joshua M. is not disabled. Filing 11-3 at 8 (AR 67).

In the reconsideration determination issued on March 24, 2021, Patricia Newman, Ph.D., state consulting psychologist, found that Joshua M.'s mental impairments of depression, anxiety, and substance abuse were not severe in nature, based on her review of the evidence of record. Filing 11-3 at 15 (AR 74). Dr. Newman also concluded that Joshua M.'s medically determinable mental impairments did not precisely satisfy the criteria of their respective listings under 20 C.F.R. Pt. 404, Subpt. P, App. 1. Filing 11-3 at 15 (AR 74). Dr. Newman also noted that Joshua M. has mild mental limitations in adapting or managing himself, and in interacting with others. Filing 11-

---

[6] Dr. Surrusco cited three jobs that he believed Joshua M. could perform, given his physical impairments: Mail Clerk, Cleaner Housekeeping, and Silver Wrapper (which is essentially a cafeteria attendant who assembles silverware wrapped in napkins). Filing 11-3 at 8 (AR 67).

3 at 15 (AR 74). Dr. Newman concluded that no determination of mental RFC was necessary in this case. Filing 11-3 at 18 (AR 77).

Further in the reconsideration determination, Daniel R. Cronk, M.D., state consulting physician, reviewed the evidence of record and concluded that Joshua M.'s statements regarding his symptoms were partially consistent with all of the medical evidence of record. Filing 11-3 at 16 (AR 75). Dr. Cronk then evaluated Dr. Dewan's medical opinion, which attested to Joshua M.'s physical disabilities.[7] In regard to Dr. Dewan's opinion, Dr. Cronk noted the fact that the opinion had been made roughly four months after Joshua M. had been seen by Dr. Dewan. Filing 11-3 at 17 (AR 76). Dr. Cronk also noted that there was no exam to accompany or support Dr. Dewan's opinion. Filing 11-3 at 17 (AR 76). Dr. Cronk then noted that the non-exertional limitations noted in Dr. Dewan's medical opinion were not supported by the objective medical evidence of record. Filing 11-3 at 17 (AR 76). Dr. Cronk concluded that "[t]he opinion relies heavily on the subjective report of symptoms provided by the individual, and the totality of the evidence does not support the opinion." Filing 11-3 at 17 (AR 76). Dr. Cronk further opined that Joshua M.'s visits with Dr. Dewan were "too sporadic to obtain a longitudinal picture of [Joshua M.'s] impairment-related limitations and restrictions." Filing 11-3 at 17 (AR 76). Moreover, Dr. Cronk noted that Dr. Dewan's medical opinion was "without substantial support" from Dr. Dewan himself, "which render[ed] it less persuasive." Filing 11-3 at 17 (AR 76).

In the next section of the reconsideration determination, Dr. Cronk evaluated Joshua M.'s physical RFC. Filing 11-3 at 17 (AR 76). In the physical RFC evaluation, Dr. Cronk indicated that

---

[7] Dr. Dewan's Medical Source Statement from October 2020 is the medical opinion addressed in Dr. Cronk's evaluation. *See generally* Filing 11-7 at 107–110, 162–165 (AR 397–400, 452–455). According to the record, Dr. Dewan had seen Joshua M. roughly four months prior to this date, on June 8, 2020. At this appointment, Joshua M. was prescribed Xyrem to improve his nighttime sleep. *See generally* Filing 11-7 at 125, 167 (AR 415, 457). However, Dr. Dewan's progress notes from the June 8, 2020, appointment were not contained in the medical evidence of record.

Joshua M. does not have any exertional limitations as a result of his medically determinable physical impairments. Filing 11-3 at 17 (AR 76). *Contra* Filing 11-3 at 6 (AR 65) (finding that Joshua M. had postural limitations). Dr. Cronk also noted that Joshua M. should avoid all exposure to workplace environments with hazards such as machinery and heights, "due to the potential for a cataplectic episode and subsequent injury." Filing 11-3 at 17 (AR 76); *see also* Filing 11-3 at 6 (AR 65) (finding that Joshua M. had the same environmental limitations). Dr. Cronk further opined that Joshua M. should avoid driving a vehicle for the same reasons. Filing 11-3 at 17 (AR 76). In light of his physical RFC findings, Dr. Cronk concluded that Joshua M. was not limited to unskilled work because of his impairments. Filing 11-3 at 18 (AR 77). *Contra* Filing 11-3 at 8 (AR 67) (finding that Joshua M. was limited to unskilled work due to his impairments). In light of the seven strength factors of the physical RFC, Dr. Cronk concluded that Joshua M. has no exertional limitations to his physical RFC.[8] Filing 11-3 at 18 (AR 77). *Contra* Filing 11-3 at 8 (AR 67) (finding that Joshua M. has a light maximum sustained work capability). Based on his evaluation of the record, Dr. Cronk concluded that Joshua M. is not disabled. Filing 11-3 at 19 (AR 78).

d.   Joshua M.'s Personal Testimony at the ALJ Hearing

On November 24, 2021, the ALJ held a hearing to review the Commissioner's denial of Joshua M.'s application for supplemental security income benefits. Filing 11-2 at 33 (AR 32). Joshua M. appeared via teleconference, represented by his attorney. Filing 11-2 at 33 (AR 32). Joshua M. testified that he had not worked since he quit his part-time employment at Jimmy John's approximately one year prior to the hearing. Filing 11-2 at 37 (AR 36). Joshua M. explained that he quit his job because his boss would often get angry, and the work environment was "toxic" as a result. Filing 11-2 at 38 (AR 37). Later in the hearing, Joshua M. described an incident where his

---

[8] Dr. Cronk cited three occupations that he believed were suitable for Joshua M., notwithstanding his disabilities: Type-Copy Examiner, Splicer, and Surveillance-System Monitor. Filing 11-3 at 19 (AR 78).

boss criticized him at work, and he further explained that this incident contributed to his resignation from his Jimmy John's position. Filing 11-2 at 52 (AR 51). Joshua M. also stated that he would work shifts that were between two and six hours in length at Jimmy John's. Filing 11-2 at 39 (AR 38). Joshua M. said that he would sometimes sleep during his shifts. Filing 11-2 at 39 (AR 38). Joshua M. also stated that he received criticism from other employees for moving slowly while working at Jimmy John's. Filing 11-2 at 39 (AR 38).

When asked about the commute to his AA meetings in Bellevue, Nebraska, Joshua M. explained that this commute was roughly five minutes in duration. Filing 11-2 at 39–40 (AR 38–39). Shortly thereafter, Joshua M. stated that he has adhered to his treating physicians' recommendations that he drive for no longer than 15 minutes at a time. Filing 11-2 at 40 (AR 39). Joshua M. later explained that he usually takes a 15-minute nap after driving before he goes inside to attend the AA meetings. Filing 11-2 at 47–48 (AR 46–47). Joshua M. also recalled having to take a nap after he attended a 30-to-60-minute meeting with his attorney. Filing 11-2 at 48 (AR 47). Joshua M. stated that he can tell when he is about to have a sleep attack and that he will stop at a gas station to take a nap if he feels an episode is about to occur. Filing 11-2 at 40 (AR 39). Further in the hearing, when asked about the length of his sleep attacks, Joshua M. explained that his sleep attacks were usually between 15 and 30 minutes long. Filing 11-2 at 43 (AR 42). Joshua M. further explained that his sleep attacks occur randomly and there were some days when he did not have any sleep attacks. Filing 11-2 at 43 (AR 42). When asked if he still experiences cataplexy episodes, Joshua M. said, "I really don't experience it at the level I used to in high school. I think a lot of it has to do with the medications I'm on[.]" Filing 11-2 at 49 (AR 48). Joshua M. could not give an exact estimate of the frequency of his cataplexy episodes, but he explained that he is able to catch himself from falling whenever he has an episode. Filing 11-2 at 50 (AR 49).

When asked about the online classes he was taking at Metropolitan Community College, Joshua M. explained that he devotes approximately two to three hours to each of his two classes every week. Filing 11-2 at 41–42 (AR 40–41). Later in the hearing, Joshua M. reported that he is unable to complete two to three hours of classwork in one continuous sitting. Filing 11-2 at 53 (AR 52). Joshua M. reported having "pretty good" grades in his classes. Filing 11-2 at 42 (AR 41). Joshua M. also stated that he planned to take additional classes the next semester. Filing 11-2 at 42 (AR 41). Later in the hearing, Joshua M. explained that he tries to do his classwork about 30 minutes after his morning medication. Filing 11-2 at 52 (AR 51). Joshua M. further explained that he sometimes stops his work to take a nap, even when he has taken his morning medication. Filing 11-2 at 52–53 (AR 51–52). Joshua M. then reported that he had unsuccessfully taken in-person courses in the past, because he "fell asleep during every class[.]" Filing 11-2 at 53 (AR 52). Joshua M. claimed that he fell asleep during the in-person classes because he was not on the medication regimens that he currently uses to manage his condition. Filing 11-2 at 54 (AR 53).

When asked if he performed any chores around the house, Joshua M. explained that he cleans his room, washes dishes, and takes the trash outside. Filing 11-2 at 42–43 (AR 41–42). When questioned regarding his social activities, Joshua M. explained that he uses social media platforms to engage with friends. Filing 11-2 at 44 (AR 43). The ALJ asked Joshua M. if he ever socializes with friends in person, and Joshua M. explained that he does not see friends in person as much because his friends often want to hang out at nighttime, which he cannot do. Filing 11-2 at 44 (AR 43). When asked about other activities, Joshua M. also reported going out to eat with his grandparents. Filing 11-2 at 44 (AR 43).

In regard to his medication regimens, Joshua M. stated that he takes Xyrem two times per night. Filing 11-2 at 45 (AR 44). Joshua M. explained that sometimes his Xyrem did not put him

to sleep for as long as it was supposed to. Filing 11-2 at 45 (AR 44). Joshua M. then reported

taking modafinil during the day to help him stay awake. Filing 11-2 at 45 (AR 44). Joshua M.

explained that his modafinil was effective on some days but not on others. Filing 11-2 at 46–47

(AR 45–46). Joshua M. claimed that his modafinil medication was "not working more than [it was]

working." Filing 11-2 at 47 (AR 46).

When Joshua M. was asked to identify his mental health conditions, Joshua M. said, "I

have depression, PTSD, and anxiety." Filing 11-2 at 54 (AR 53). When asked if his mental health

conditions affect or contribute to his difficulty maintaining full-time employment, Joshua M.

replied, "I don't know. I just don't know if those do as much as my narcolepsy." Filing 11-2 at 54

(AR 53). Joshua M. also stated that he has "very bad short-term memory" as a result of his

narcolepsy. Filing 11-2 at 55 (AR 54).

### 3.   The ALJ's Impairment Findings

Pursuant to 20 C.F.R. § 416.920(b), an ALJ will engage in a five-step sequential analysis

to determine whether a claimant is disabled. *See Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir.

2021) (citing *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)). When conducting the five-

step analysis, the ALJ considers the following:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a
> severe impairment, (3) whether the impairment meets the criteria of any Social
> Security Income listings, (4) whether the impairment prevents the claimant from
> performing past relevant work, and (5) whether the impairment necessarily
> prevents the claimant from doing any other work.

*Grindley*, 9 F.4th at 628 (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005))

(internal citation omitted)).

The claimant generally has the burden of proving that he or she is disabled throughout each

step of the analysis, with the exception of the fifth step, where the Social Security Administration

has a burden of proving that other work exists in significant numbers in the national economy that

the claimant can perform. *See* 20 C.F.R. §§ 416.912(a)-(b), 416.960(c). If it is determined that the claimant is disabled at steps three or five, or if it is determined that the claimant is not disabled at steps one, two four, or five, then the ALJ will not proceed to the next step of the evaluation. *See* 20 C.F.R. § 416.920(a).

At the first step of the analysis, the ALJ will find the claimant is not disabled if the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). Substantial gainful activity is defined as "work activity that is both substantial and gainful." 20 C.F.R. § 416.972. Substantial work activity is defined as "work activity that involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). Gainful work activity is defined as work activity that the claimant performs in exchange for pay or profit. 20 C.F.R. § 416.972(b). In this case, the ALJ found that the only work activity that Joshua M. had engaged in since the amended alleged onset date of February 13, 2020, was his part-time employment at Jimmy John's. Filing 11-2 at 16 (AR 15). However, the ALJ determined that Joshua M.'s part-time employment did not rise to the level of substantial gainful activity. Filing 11-2 at 16 (AR 15).

At step two, the ALJ examines the medical severity of the claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii). At this step, the ALJ will determine if the claimant has a severe impairment or a combination of severe impairments. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant does not have a severe impairment or a combination of severe impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," then he or she will not be found to be disabled. 20 C.F.R. § 416.920(c). In this case, the ALJ found that Joshua M.'s physical impairment of narcolepsy with cataplexy significantly limits Joshua M.'s ability to perform basic work activities under the regulations. Filing 11-2 at 16 (AR 15). However, the ALJ found that Joshua M.'s mental impairments of generalized anxiety disorder, major depressive

20

disorder, and substance use disorder were not severe, because they "do not cause more than minimal limitation in [Joshua M.'s] ability to perform basic mental work activities[.]" Filing 11-2 at 16–17 (AR 15–16).

In analyzing Joshua M.'s mental impairments, the ALJ considered Joshua M.'s history of mental health treatment, which included the medication and psychotherapy. Filing 11-2 at 17 (AR 16). The ALJ noted that Joshua M.'s mental symptoms have improved with the combination of these treatments. Filing 11-2 at 17 (AR 16). Based on the medical evidence of record, the ALJ determined that Joshua M. had shown a trend of improvement in his mental health during each of his psychotherapy appointments from February 2020 onward. Filing 11-2 at 17 (AR 16).[9] Moreover, the ALJ pointed to the fact that Joshua M. had discontinued his use of Prozac around September 2020, without any reported difficulties. Filing 11-2 at 17 (AR 16); Filing 11-7 at 135 (AR 425). The ALJ also took note of the fact that Joshua M. was not observed to have a particularly anxious affect, even when he reported anxiety to his treating physicians. Filing 11-2 at 17 (AR 16). Lastly, the ALJ noted that Joshua M. had discontinued drug and alcohol use prior to the amended alleged onset date and had not relapsed since. Filing 11-2 at 17 (AR 16).

In evaluating the severity of Joshua M.'s mental impairments, the ALJ also considered the four functional areas of mental functioning, enumerated at 20 C.F.R., Pt. 404, Subpt. P, App. 1. Filing 11-2 at 17 (AR 16). The first area of functional limitation is the claimant's ability to understand, remember, and apply information. 20 C.F.R., Pt. 404, Subpt. P, App. 1. The ALJ noted that Joshua M. has mild limitations in this functional area. Filing 11-2 at 17 (AR 16). The second functional area is the claimant's ability to interact with others. 20 C.F.R., Pt. 404, Subpt. P, App.

---

[9] *See, e.g.*, Filing 11-7 at 82 (AR 372) (Joshua M. stating his mood was "good", despite some feelings of worthlessness); Filing 11-7 at 102 (AR 392) (showing Joshua M.'s continued improvement); Filing 11-7 at 121 (AR 411) (same); Filing 11-7 at 127 (AR 417) (same).

1. The ALJ found that Joshua M. has no limitations in this functional area. Filing 11-2 at 17 (AR 16). The third functional area of mental functioning is the claimant's ability to concentrate, persist, or maintain pace. 20 C.F.R., Pt. 404, Subpt. P, App. 1. In this area, the ALJ found that Joshua M. has mild limitations. Filing 11-2 at 17–18 (AR 16–17). The final functional area of mental functioning is the claimant's ability to adapt or manage themselves. 20 C.F.R., Pt. 404, Subpt. P, App. 1. The ALJ found that Joshua M. has no limitations in this area. Filing 11-2 at 18 (AR 17).

At step three of the sequential analysis, the ALJ must determine whether the claimant's impairments satisfy the criteria of severity of one of the impairments listed at 20 C.F.R., Pt. 404, Subpt. P, App. 1. *See* 20 C.F.R. § 416.920(d). Since narcolepsy is not a listed impairment under 20 C.F.R, Part 404, Subpt. P, App. 1, the ALJ determined that it cannot be found to meet one of the listings. Filing 11-2 at 18 (AR 17). The ALJ also did not find any evidence of record that supported a finding of medical equivalence from the state medical consultants. Filing 11-2 at 18 (AR 17). Since Joshua M.'s disability did not meet or equal one of the listings at 20 C.F.R, Part 404, Subpt. P, App. 1, the ALJ proceeded to the next step of the sequential analysis. Filing 11-2 at 19 (AR 18).

### 4. *The ALJ's RFC Findings*

In the fourth step of the sequential analysis, the ALJ is tasked with determining the claimant's residual functional capacity (RFC), in light of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). A claimant's RFC is defined as "the most [the claimant] can still do despite [their] limitations." 20 C.F.R. § 416.945(a)(1). The claimant is generally responsible for providing the evidence that the ALJ uses to determine the claimant's RFC. *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)); *see also* 20 C.F.R. §§ 416.912(a)(1), 416.945(a)(3). It has also been clearly established that "[t]he ALJ determines a claimant's RFC based on all relevant evidence, including medical

records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger*, 390 F.3d at 591. *Cf. Lockwood v. Colvin*, 627 F. App'x 575, 577 (8th Cir. 2015) (quoting *Cox v. Astrue*, 495 F.3d 614, 619–20 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively."). In regard to Joshua M.'s RFC, the ALJ concluded:

> After careful examination of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: He cannot climb ropes, ladders, or scaffolds or drive commercial vehicles. He can have no exposure to workplace hazards such as unprotected heights, large bodies of water, or close proximity to dangerous moving mechanical parts.

Filing 11-2 at 19 (AR 18).

Next, the ALJ will consider the claimant's RFC in conjunction with the claimant's vocational background to determine whether the claimant is disabled. 20 C.F.R. §§ 416.960(a), 416.920(a)(4)(iv). If the claimant is able to perform his or her past relevant work, then the ALJ will find that the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). The claimant's past relevant work includes work that the claimant has done "within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 416.960(b)(1); *see generally* 20 C.F.R § 416.965(a). Nonetheless, even if a claimant has no work experience, the ALJ "may consider that [the claimant] [is] able to do unskilled work because it requires little or no judgment and can be learned in a short period of time." 20 C.F.R § 416.965(a). In the case at hand, Joshua M. did not have any past relevant work. Filing 11-2 at 25 (AR 24); *see id.* Accordingly, the ALJ found that Joshua M. had not performed any past relevant work at the substantial gainful activity level. Filing 11-2 at 25 (AR 24).

5.  *The ALJ's Findings Regarding the Claimant's Ability to do Other Work*

At the final step of the sequential analysis, the ALJ will consider the assessment of the claimant's RFC from step four, along with the claimant's age, education, and work experience, to determine whether the claimant can adjust to other work. 20 C.F.R § 416.920(a)(4)(v). While the claimant still has the general burden of proving his or her disability at this step, the Commissioner has a limited burden of providing "evidence about the existence of other work in the national economy that [the claimant] can do" in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 416.912(b)(3), 416.912(a)(1); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir 2005) (quoting *Eichelberger*, 390 F.3d at 591) (reiterating the Commissioner's limited burden of going forward). If the claimant is able to perform other work, the ALJ will find that the claimant is not disabled. 20 C.F.R § 416.920(a)(4)(v). Conversely, if the claimant is unable to adjust to other work, the ALJ will find that the claimant is disabled. *Id.* The ALJ may have a vocational expert testify at the administrative hearing to "offer an opinion on the ultimate question whether [the] claimant is capable of gainful employment," in light of the claimant's medical limitations and the evidence of record. *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021) (quoting *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995)).

In this case, vocational expert Jennifer Ruhnke testified at the administrative hearing as to whether Joshua M. has the ability to perform other work, notwithstanding his disability. Filing 11-2 at 56–61 (AR 55–60). The ALJ asked Ms. Ruhnke if any jobs were available for a hypothetical person of Joshua M.'s age and education, who "has no exertional limitations, but no ability to climb ropes, ladders, or scaffolds or to drive commercial vehicles and should have no exposure to workplace hazards, such as unprotected heights, large bodies of water, or close proximity to dangerous moving mechanical parts." Filing 11-2 at 57 (AR 56). In response to the ALJ's inquiry, Ms. Ruhnke cited three occupations that she believed Joshua M. would be able to perform:

24

"counter supply worker" (319.687-010)[10]; "change house attendant" (358.687-010); and "hand packager" (920.587-018), which amounted to 188,000 available jobs in the national economy. Filing 11-2 at 57 (AR 56).

In light of the testimony of the vocational expert, as well as Joshua M.'s RFC, age, education, and work experience, the ALJ determined that Joshua M. could make a successful adjustment to other work that exists in significant numbers in the national economy. Filing 11-2 at 26 (AR 25). Accordingly, the ALJ found that Joshua M. was not disabled at step five of the sequential analysis. Filing 11-2 at 26 (AR 25); *see generally* 20 C.F.R. § 416.920(g)(1).

## II. LEGAL ANALYSIS

### A. Standard of Review

After a claimant has sought review of an ALJ's decision by the Appeals Council, the claimant is entitled to judicial review of the ALJ's decision in federal district court. *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019); *see also* 42 U.S.C. § 405(g). On review, the district court determines "whether substantial evidence on the record as a whole supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (internal citation omitted)). Substantial evidence has been described as "more than a mere scintilla." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (citation omitted) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229)); *see Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

---

[10] The Social Security Administration primarily relies on the *Dictionary of Occupational Titles* (DOT) for gathering information about occupations in the national economy. Every occupational title in the DOT has a corresponding nine-digit identification number. *How to Find an Occupational Title and Code*, Information Technology Associates (Apr. 11, 2020), https://occupationalinfo.org/front_580.html.

Under the substantial evidence standard, the district court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)). However, the district court will not reverse an ALJ's decision "simply because some evidence supports a conclusion other than that reached by the [ALJ]." *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). The district court will affirm the ALJ's decision "[i]f, after reviewing the record, the [district] court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff*, 421 F.3d at 789). Moreover, the district court will not reverse the ALJ's decision simply because the district court "would have come to a different conclusion" on its own. *Id.* (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (internal citation omitted)); *see also Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000) ("We will not reverse the [ALJ's] decision 'merely because substantial evidence supports a contrary outcome'")). The district court should also defer to the ALJ's credibility determinations as long as they are supported by good reasons and substantial evidence. *See Despain*, 926 F.3d at 1028.

Additionally, the district court is tasked with determining whether the ALJ's decision "complies with the relevant legal standards." *Lucas v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (internal citations omitted) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (omission in original) (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011)). In conducting its review of the ALJ's decision under the substantial evidence standard, the district court "must view the record in the light most favorable to [the ALJ's]

determination." *Dols*, 931 F.3d at 748 (alteration in original) (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

## B. Discussion

As stated in the factual background, *supra*, Joshua M. first maintains that the ALJ erred in determining that Dr. Dewan's opinion was not persuasive with respect to the severity of Joshua M.'s mental impairments. Filing 13-1 at 13–14. Secondly, Joshua M. argues that the ALJ's findings regarding Joshua M.'s ability to work an 8-hour workday are not based on substantial evidence in the record. Filing 13-1 at 15–19. In particular, Joshua M. contends that the ALJ failed to consider the type, dosage, and effectiveness of his medication, Joshua M.'s testimony, Dr. Dewan's medical source statement, lay witness statements, and other medical evidence when rendering the administrative decision. Filing 13-1 at 15. In the third section of his argument, Joshua M. maintains that the ALJ did not properly consider all the evidence in the record. Filing 13-1 at 17. Specifically, Joshua M. argues the ALJ focused on the need for objective evidence and Joshua M.'s credibility instead of his symptoms. Filing 13-1 at 17.

### 1. The ALJ's Consideration of Dr. Dewan's Opinions

In relation to his first argument, Joshua M. maintains that the administrative decision "does not address the specific medical opinions of Dr. Dewan, or provide analysis of the consistency and supportability of his opinions." Filing 13-1 at 13. In particular, Joshua M. asserts that the ALJ failed to consider the limitations enunciated in Dr. Dewan's medical source statement, namely: "can only perform work that is closely supervised," as well as "serious limitations in [Joshua M.'s] ability to maintain attention for two-hour segments, to perform at a consistent pace, and to deal with normal work stresses." Filing 13-1 at 14. Joshua M. further argues that none of the three jobs identified by the vocational expert would have been applicable if the limitations in the medical source statement had been considered. Filing 13-1 at 14. Joshua M. also asserts that the ALJ's RFC

determination would have been different if these limitations had been considered. Filing 13-1 at 14. In the case at hand, the ALJ found that Dr. Dewan's opinions were persuasive as to Joshua M.'s physical limitations, but unpersuasive as to Joshua M.'s mental limitations. Filing 11-2 at 23 (AR 22).

Contrary to the assertions in Joshua M.'s brief, the ALJ took time to address Dr. Dewan's specific medical opinions throughout the administrative decision. *See* Filing 11-2 at 16–24 (AR 15–23). Moreover, the ALJ analyzed the consistency and supportability of Dr. Dewan's opinions in rendering the administrative opinion. *See* Filing 11-2 at 23–24 (AR 22–23); *see also Nolen v. Kijakazi*, 61 F.4th 575, 577 (8th Cir. 2023) (finding that an ALJ did not need to discuss the other factors under 20 C.F.R. § 404.1520c(b)(2) after discussing the supportability and consistency of a treating physician's opinion). *See generally* 20 C.F.R. § 416.920c(b)(2) (indicating that supportability and consistency are the only factors an ALJ is required to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings). Pertaining to Dr. Dewan's medical source statement opinions regarding Joshua M.'s mental limitations, the ALJ stated:

> "Precisely because there are no clinical findings and observations showing mental abnormalities due to narcolepsy, the opinions of Dr. Dewan about mental limitations are inconsistent with the record as a whole (6F/4–7; 12F). His opinions on this matter are not supported by his treatment notes, which document no observed mental abnormalities (3F; 13F; 14F)."

Filing 11-2 at 23 (AR 22).

Indeed, there were no references to mental limitations arising from narcolepsy or cataplexy at any point in Dr. Dewan's progress notes. *See, e.g.,* Filing 11-7 at 50–73, 104–120, 166–175, 176–184 (AR 340–363, 394–410, 456–465, 466–474). In support of the above statements, the ALJ cited the exhibits in the record that contained Dr. Dewan's progress notes and his medical source

28

statement. Filing 11-2 at 23 (AR 22). *Compare* Filing 11-7 at 50–73, 104–120, 166–175, 176–184 (AR 340–363, 394–410, 456–465, 466–474) (Dr. Dewan's progress notes making no reference to mental limitations) *with* Filing 11-7 at 162–165 (AR 452–455) (Dr. Dewan's medical source statement making reference to mental limitations). Since there are no references to mental limitations arising from Joshua M.'s narcolepsy or cataplexy at any point in Dr. Dewan's progress notes, the ALJ's finding of inconsistency in Dr. Dewan's opinion regarding Joshua M.'s mental limitations is proper.

The Eighth Circuit Court of Appeals has clearly stated that "[a] conclusory report from a treating physician may still be entitled to controlling weight if it is accurate when viewed in the context of the medical record." *Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019) (citing *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003)). However, the Eighth Circuit has also said that "[a]n ALJ properly discredits such a report . . . if it is unsupported by the medical record." *Id.* (citing *Stormo v. Barnhart*, 377 F.3d 801, 805–06 (8th Cir. 2004)). In the case at hand, Dr. Dewan made no references to mental limitations associated with Joshua M.'s narcolepsy and cataplexy in his progress notes. *See, e.g.*, Filing 11-7 at 50–73, 104–120, 166–175, 176–184 (AR 340–363, 394–410, 456–465, 466–474). The only references to mental limitations arising from Joshua M.'s narcolepsy and cataplexy were in Dr. Dewan's medical source statement. *See, e.g.*, Filing 11-7 at 162–165 (AR 452–455). When viewed in context of the other medical evidence of record, it is clear that Dr. Dewan's opinions regarding Joshua M.'s mental limitations in the medical source statement are not entitled to controlling weight. As such, there is substantial evidence in the record to support the ALJ's finding that Dr. Dewan's opinions regarding Joshua M.'s mental limitations are unpersuasive.

In his brief, Joshua M. argues that "[e]ven when a treating physician's opinion is not entitled to controlling weight, the opinion is typically entitled to substantial weight and should not ordinarily be disregarded without good reason." Filing 13-1 at 13 (citing *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015)). Notably, in the case of *Miller*, the claimant contested the amount of weight given to his treating physician's opinion by the ALJ, and cited a portion of the above quote from *Cunningham v. Apfel* in making that argument. *Miller*, 784 F.3d at 477 (quoting *Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000)). Nevertheless, the Eighth Circuit stated further :

> "[T]he opinion of a treating physician 'does not automatically control or obviate the need to evaluate the record as a whole.' In fact, 'an ALJ may discount or even disregard the opinion of a treating physician where . . . a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"

*Id.* (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001), and *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal citations omitted)).

In the case at hand, when evaluating the record as a whole, the ALJ noted that Dr. Dewan's opinions regarding Joshua M.'s mental limitations were inconsistent with Dr. Dewan's other progress notes in the record. Filing 11-2 at 23–24 (AR 22–23); *see Miller*, 784 F.3d at 477. In accordance with Eighth Circuit case law, and in light of these inconsistencies, the ALJ properly discounted Dr. Dewan's opinions of Joshua M.'s mental limitations from the medical source statement. *See Despain*, 926 F.3d at 1028 (citing *Cox*, 345 F.3d at 609) (finding that an ALJ properly discredits a treating physician's report if it is inconsistent with the other medical evidence of record); *see also Miller*, 784 F.3d at 477 (quoting *Hogan*, 239 F.3d at 961, and *Wildman*, 596 F.3d at 964).

As it pertains to Dr. Dewan's opinions about Joshua M.'s physical limitations, the ALJ stated in relevant part:

30

"Treatment notes establish [Joshua M.'s] history of narcolepsy and the need for medications to help him remain awake during the day, but they also clearly show that the medications are effective at reducing [Joshua M.'s] daytime drowsiness and allowing him to stay awake for longer periods of time (13F). . . . The need for naps was decreased further once [Joshua M.] improved his sleep hygiene (13F)."

Filing 11-2 at 21 (AR 20). In making this finding, the ALJ cited Dr. Dewan's treatment notes from December 17, 2020, and May 18, 2021. Filing 11-2 at 21 (AR 20); *see* Filing 11-7 at 166–175 (AR 456–465). The ALJ properly noted that Dr.  Dewan's October 22, 2020, medical source statement could not have considered Joshua M.'s subsequent improvement in daytime sleepiness, which occurred between December 17, 2020, and May 18, 2021. Filing 11-2 at 23 (AR 22). This subsequent improvement in daytime sleepiness is reflected in Dr. Dewan's progress notes from the appointments on these respective dates, which the ALJ cited in the quote above. Filing 11-2 at 21 (AR 20). *See, e.g.*, Filing 11-7 at 169, 178 (AR 459, 468) (Joshua M. reported having improved sleep); Filing 11-7 at 172, 175, 181, 184 (AR 462, 465, 471, 474) (Joshua M. reported going to bed between 10 PM and 11 PM each night, and waking up between 6:30 AM and 7 AM each morning).

The ALJ found that Dr. Dewan's opinions about work-related physical limitations were "consistent with narcolepsy and [Joshua M.'s] response to treatment, both in terms of the limitations recommended and those deemed to be unnecessary." Filing 11-2 at 24 (AR 23). Additionally, the ALJ found that "Dr. Dewan's determination that neither additional breaks nor exertional limitations are necessary is consistent with the evidence about the effectiveness of medication, the results of physical examination, and [Joshua M.'s] denials of cataplexy." Filing 11-2 at 24 (AR 23). In making this finding, the ALJ pointed to Dr. Dewan's medical source statement, as well as Dr. Dewan's progress notes from 2019–2021. Filing 11-2 at 24 (AR 23). Moreover, the ALJ noted that Joshua M. had not experienced any cataplexy symptoms since the

amended alleged onset date of February 13, 2020. Filing 11-2 at 23 (AR 22). In support of this finding, the ALJ cited Dr. Dewan's progress notes since the amended alleged onset date. Filing 11-2 at 23 (AR 22); *see also* Filing 11-7 at 166–175 (AR 456–465).

The ALJ further noted that no limitations in Joshua M.'s gait, strength, or muscle tone were identified in Dr. Dewan's progress notes. Filing 11-2 at 23–24 (AR 22–23); *see* Filing 11-7 at 140–156, 166–175, 176–184 (AR 430–446, 456–465, 466–474). Lastly, the ALJ noted that Dr. Dewan did not identify any limitations in Joshua M.'s ability to stand, walk, or lift in his medical source statement. Filing 11-2 at 24 (AR 23); *see* Filing 11-7 at 162–165 (AR 452–455). Despite Joshua M.'s contentions, the administrative decision shows that the ALJ consistently cited Dr. Dewan's opinions in making his findings. As such, there is substantial evidence in the record to support the ALJ's findings regarding Joshua M.'s physical abilities.

In the case at hand, the ALJ clearly considered the supportability and consistency of Dr. Dewan's opinions when making findings about Joshua M.'s mental and physical limitations. The supportability and consistency factors are the only two factors under 20 C.F.R. § 416.920c(c) that an ALJ must consider in rendering an administrative decision. *See* 20 C.F.R. § 416.920c(b)(2); *see also Nolen*, 61 F.4th at 577 (8th Cir. 2023) (finding that an ALJ need only discuss the supportability and consistency of a treating physician's opinion). The Eighth Circuit has made clear, and the Commissioner correctly points out, that "the ALJ is free to accept some, but not all, of a medical opinion." *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022) (citing *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) and *Clay v. Barnhart*, 417 F.3d 922, 930 (8th Cir. 2005)). Moreover, it has also been established that "the ALJ is not required to 'explicitly … reconcile every conflicting shred of medical evidence.'" *Id.* (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). In examining Dr. Dewan's opinions, the ALJ first determined that Dr. Dewan's opinions regarding

Joshua M.'s mental limitations were not persuasive. Filing 11-2 at 23 (AR 22); *see Despain*, 926 F.3d at 1028 (citing *Cox*, 345 F.3d at 609) (finding that an ALJ properly discredits a treating physician's report if it is inconsistent with the other medical evidence of record). Secondly, the ALJ determined that Dr. Dewan's opinions regarding Joshua M.'s physical abilities were persuasive and consistent with Joshua M.'s condition and his responses to treatment. Filing 11-2 at 24 (AR 23). In light of the foregoing, the ALJ's findings regarding Joshua M.'s physical and mental limitations are supported by substantial evidence in the record.

### 2. The ALJ Provided Adequate Rationale for His Conclusion that Joshua M. Could Work a Fulltime Workday

In the second section of his argument, Joshua M. asserts that the ALJ "failed to provide adequate rationale" for finding that Joshua M. could sustain concentration and perform work tasks for two-hour segments with normal breaks during a typical eight-hour workday. Filing 13-1 at 15. Joshua M. argues that the ALJ did not adequately consider Joshua M.'s testimony or the type, dosage, effectiveness, and side effects of Joshua M.'s medications in making these findings. Filing 13-1 at 15–16. *See generally* 20 C.F.R. § 416.929(c). Joshua M. also argues that the ALJ failed to address Joshua M.'s testimony, Dr. Dewan's medical source statement, lay witness statements, and other medical evidence in making these findings. Filing 13-1 at 15.

It has long been established in the Eighth Circuit that an ALJ must consider the following factors when evaluating a claimant's subjective complaints,

> the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. Another factor to be considered is the absence of objective medical evidence to support the [claimant's] complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence.

*Grindley v. Kijakazi*, 9 F.4th 622, 630 (8th Cir. 2021) (internal citations omitted) (quoting *Halverson*, 600 F.3d at 931–32). These factors are known as the *Polaski* factors, originally

33

enunciated in the case of *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Additionally, while the ALJ must consider each of these factors before discounting a claimant's subjective complaints, the ALJ need not discuss each factor. *Id.* (quoting *Halverson*, 600 F.3d at 932). Furthermore, the Eighth Circuit has found that an ALJ's evaluation of a claimant's symptoms will be given deference if the ALJ gives good reasons to support the evaluation, and if the evaluation is supported by substantial evidence. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007) (quoting *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003)).

In the case at hand, the ALJ first addressed Joshua M.'s alleged need for additional breaks or naps throughout the workday. Filing 11-2 at 20 (AR 19). *See generally* Filing 11-6 at 65–70 (AR 255–260). The ALJ found that Joshua M.'s subjective complaints were unpersuasive because of their inconsistency with the medical evidence. Filing 11-2 at 21 (AR 20). The ALJ pointed to the effectiveness of Joshua M.'s medications in reducing his daytime sleepiness, and the ALJ cited Joshua M.'s disability report to support this finding. Filing 11-2 at 21 (AR 20); Filing 11-6 at 65–70 (AR 255–260). The ALJ also noted Joshua M.'s further improvement in daytime sleepiness after Joshua M. improved his sleep hygiene. Filing 11-2 at 21 (AR 20). Indeed, after Joshua M. followed Dr. Dewan's recommendation to improve his sleep hygiene, Joshua M. did not report a need for daytime naps at his subsequent visit with Dr. Dewan. *See* Filing 11-7 at 166–70 (AR 456–60). In fact, Joshua M. reported having improved nighttime sleep and less daytime sleepiness for the time period between his December 17, 2020, and May 18, 2021, appointments. Filing 11-7 at 171–72, 175, 180–81, 184 (AR 461–62, 465, 470–71, 474).

Additionally, the ALJ noted that even after the effectiveness of Joshua M.'s modafinil medication allegedly decreased in spring of 2021, Joshua M. still reported being able to remain awake for three hours at a time after modafinil doses. Filing 11-2 at 21 (AR 20); Filing 11-6 at 66

34

(AR 256). Importantly, the ALJ also noted that Joshua M. never reported the alleged decrease in effectiveness of his modafinil to Dr. Dewan during his appointment on May 18, 2021. Filing 11-2 at 21 (AR 20); Filing 11-7 at 166–175, 176–184 (AR 456–465, 466–474). At the administrative hearing, Joshua M. testified that he would take naps during his shifts at Jimmy John's. Filing 11-2 at 39 (AR 38). However, the ALJ noted that Joshua M. did not report needing extra naps in his work history report from April 2020. Filing 11-2 at 22 (AR 21); Filing 11-6 at 28–33 (AR 218–223). Moreover, at his appointment with Dr. Dewan in May of 2021, Joshua M. stated that he was not allowed to take brief naps while at work. Filing 11-2 at 22 (AR 21); Filing 11-7 at 172–73, 181–82 (AR 462–63, 471–72). As to the discrepancies between Joshua M.'s oral testimony and his statements from the work history report and the appointment with Dr. Dewan, the ALJ found the latter two to be more persuasive, in light of their closer proximity to Joshua M.'s employment at Jimmy John's. Filing 11-2 at 22 (AR 21).

Furthermore, in his disability report from May 3, 2021, Joshua M. maintained that Dr. Dewan advised him to take two naps each day. Filing 11-6 at 69–70 (AR 259–260). The ALJ properly found that this allegation was also unsupported by the medical evidence of record. Filing 11-2 at 21 (AR 20). On December 17, 2020, Dr. Dewan told Joshua M. that he could take short naps during the day, if necessary. Filing 11-7 at 167, 176 (AR 457, 466). However, Joshua M. did not report needing to take daytime naps at any point during this appointment. *See generally* Filing 11-7 at 166–70, 176–79 (AR 456–60, 466–69). With respect to Matt Anthony's third-party report, the ALJ noted that this report "did not mention that [Joshua M.] regularly fell asleep or took naps, but rather described [Joshua M.] as being 'sluggish' and 'not all there' toward the end of his work shifts." Filing 11-2 at 22 (AR 21); Filing 11-6 at 51 (AR 241). The ALJ also noted that Mr. Anthony did not identify the length or frequency of Joshua M.'s difficulties. Filing 11-2 at 22 (AR

35

21); *see* Filing 11-6 at 51 (AR 241). Moreover, since Mr. Anthony's statement was not supported by the contemporary clinical findings of drowsiness or Joshua M.'s reports of the effectiveness of his medications, the ALJ found Mr. Anthony's statement to be inconsistent with the other evidence of record. Filing 11-2 at 22 (AR 21). After examining the entire record, the ALJ found that Joshua M.'s alleged need for additional naps and breaks throughout the workday was "inconsistent with the medical evidence and the other evidence in the record." Filing 11-2 at 22 (AR 21)

Joshua M. further alleged at the administrative hearing that he was unable to focus on his school work for two to three hours at a time. Filing 11-2 at 53 (AR 52). With regard to Joshua M.'s alleged difficulties in completing his college courses, the ALJ found that these allegations were neither contradicted nor corroborated by the other evidence of record. Filing 11-2 at 22 (AR 21). The ALJ pointed to the fact that Joshua M.'s testimony was not supported by the medical records that demonstrated the effectiveness of his medications. Filing 11-2 at 22 (AR 21). More importantly, the ALJ noted that Joshua M.'s reported success in his online college classes "significantly undermines [Joshua M.'s] allegation that his memory and ability to follow instructions are impaired by his narcolepsy symptoms." Filing 11-2 at 23 (AR 22); *see also* Filing 11-2 at 42 (AR 41) (Joshua M. reporting that he had "pretty good" grades in his classes). In light of these findings, the ALJ found Joshua M.'s alleged difficulties in completing college coursework were unpersuasive.

In the case at hand, the ALJ sufficiently examined all of the evidence in the record before determining that Joshua M. could work an eight-hour workday, without receiving additional breaks. Filing 11-2 at 19–24 (AR 18–23); *see Grindley* 9 F.4th at 630 (quoting *Halverson*, 600 F.3d at 931–32). Despite Joshua M.'s contentions, the ALJ properly considered Joshua M.'s medication regimens, Joshua M.'s testimony, Mr. Anthony's statement, and Dr. Dewan's opinion,

throughout the administrative decision. Filing 11-2 at 16–26 (AR 15–25). The ALJ's decision was not based solely on objective medical evidence, as Joshua M. contends. After reviewing the entire record, the ALJ properly determined that Joshua M.'s subjective complaints were "not entirely consistent with the medical evidence and other evidence in the record." Filing 11-2 at 19–20 (AR 18–19); *see Casey*, 503 F.3d at 696 (quoting *Gregg*, 354 F.3d at 714) (ALJ's evaluation of a claimant's symptoms will be given deference if the ALJ gives good reasons to support the evaluation, and if the evaluation is supported by substantial evidence). Accordingly, the ALJ properly formulated Joshua M.'s RFC, and this finding is supported by substantial evidence in the record. Filing 11-2 at 24 (AR 23); *see Casey*, 503 F.3d at 696 (quoting *Gregg*, 354 F.3d at 714).

### 3. The ALJ Properly Considered all the Evidence

In the third section of his argument, Joshua M. maintains that the ALJ did not properly consider all the evidence in the record. Filing 13-1 at 17. He argues the ALJ focused on the need for objective evidence and Joshua M.'s credibility instead of his symptoms. Filing 13-1 at 17. It should be noted that the arguments within the second and third sections of Joshua M.'s brief are intertwined in several ways. In this section of his complaint, Joshua M. alleges that "the ALJ has cited no evidence contradicting [Joshua M.'s] need for extra breaks/naps" during the workday. Filing 13-1 at 17. Nevertheless, as the foregoing analysis has already shown, the ALJ consistently cited evidence from each area of the record in determining that Joshua M. does not need extra breaks or naps during the workday.

Consistent with 42 U.S.C. § 405(g), this Court has a duty to determine "whether substantial evidence on the record as a whole supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (internal citation omitted)). In conducting its review of the ALJ's decision, this Court "must view the record in the light most favorable to [the ALJ's] determination." *Dols*, 931 F.3d at 748 (alteration in

original) (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)). This Court will affirm the ALJ's decision "[i]f, after reviewing the record, the [district] court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff*, 421 F.3d at 789). When viewing the record in the light most favorable to the ALJ's decision in this case, it is clear that the ALJ's decision is supported by substantial evidence on the record as a whole. Filing 11-2 at 16–26 (AR 15–25).

Joshua M. points this Court to Social Security Ruling (SSR) 16-3p, and asserts that "the ALJ improperly focused on the need for objective evidence and . . . [Joshua M.'s] overall credibility instead of his symptoms, as required by SSR 16-3p." Filing 13-1 at 17.With regard to SSR 16-3p, the Eighth Circuit has said:

> "Social Security Ruling 16-3p eliminates use of the term 'credibility' and clarifies that the [ALJ's] review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole."

*Lawrence v. Saul*, 970 F.3d 989, 995 n.6 (8th Cir. 2020). Moreover, this Court has made it clear in the past that the subjective complaints of a claimant, without more, do not establish the existence of a medically determinable impairment that causes the claimant's alleged symptoms. *See King v. Saul*, No. 8:19-CV-314, 2020 WL 4904071, at *4 (D. Neb. Aug. 20, 2020), *aff'd sub nom. King v. Kijakazi*, 854 F. App'x 778 (8th Cir. 2021) (citing SSR 16-3p (S.S.A. Oct. 25, 2017)); *see also* 20 C.F.R. § 416.929(a). This Court has said that "there must be objective medical evidence in the record that can reasonably be expected to cause the alleged symptoms." *Id.* (citing SSR 16-3p).

Notwithstanding Joshua M.'s contentions, the ALJ properly considered Joshua M.'s medication regimens, as well as Joshua M.'s testimony, the lay witness statements, and Dr.

Dewan's opinion, throughout the administrative decision. Filing 11-2 at 16–26 (AR 15–25). Joshua M. maintains that an ALJ may not "unfavorably evaluate an individual's symptoms based solely on objective medical evidence." Filing 13-1 at 17 (citing SSR 16-3p). However, in the case at hand, the ALJ did not exclusively consider objective medical evidence in rendering the administrative decision. Filing 11-2 at 16–26 (AR 15–25). Rather, after reviewing the entire record, the ALJ determined that Joshua M.'s subjective complaints were "not entirely consistent with the medical evidence and other evidence in the record." Filing 11-2 at 19–20 (AR 18–19); *see Lawrence*, 970 F.3d at 995 n.6 (finding that an ALJ must consider the level of consistency between claimant's subjective complaints and the entire record).

In rendering the administrative decision, the ALJ first examined Joshua M.'s history of treatment for narcolepsy with cataplexy. Filing 11-2 at 20 (AR 19). The ALJ considered Joshua M.'s medication regimens of Provigil (modafinil) and Xyrem. Filing 11-2 at 20 (AR 19). The ALJ noted Joshua M.'s positive responses to modafinil and Xyrem, which were documented in Dr. Dewan's progress notes. Filing 11-2 at 20 (AR 19); Filing 11-7 at 60 (AR 350); Filing 11-7 at 167, 176 (AR 457, 466). The ALJ further noted that the type and dosage of Joshua M.'s medications have remained the same since June of 2020. Filing 11-2 at 20 (AR 19); Filing 11-7 at 135 (AR 425). In relation to Joshua M.'s cataplexy symptoms, the ALJ correctly pointed out that there is no record of Joshua M. receiving a separate treatment for cataplexy. Filing 11-2 at 20 (AR 19). Although the ALJ noted that Joshua M. reported infrequent episodes of cataplexy in 2019, the ALJ also correctly noted that Joshua M. has not reported cataplexy symptoms to his treating physicians since the amended alleged onset date in February of 2020. Filing 11-2 at 20 (AR 19); Filing 11-7 at 60 (AR 350); Filing 11-7 at 172, 181 (AR 462, 471). Further in the administrative opinion, the ALJ addressed the limitations arising from Joshua M.'s narcolepsy. Filing 11-2 at 20 (AR 19). In

doing so, the ALJ noted that Joshua M. alleged a far wider range of limitations arising from his narcolepsy other than driving, climbing, and work around hazards. Filing 11-2 at 20 (AR 19); Filing 11-6 at 40–47 (AR 230–237).

In accordance with the *Polaski* factors enumerated above, the ALJ considered each of Joshua M.'s subjective allegations before finding that they were inconsistent with the evidence as a whole. Filing 11-2 at 20–23 (AR 19–22); *see Grindley*, 9 F.4th at 630. The administrative decision in this case was based on the ALJ's review of the entire record, including the objective medical evidence, and Joshua M.'s subjective complaints. *See Lawrence*, 970 F.3d at 995 n.6 (finding that an ALJ must consider the level of consistency between claimant's subjective complaints and the entire record); *see also King*, 2020 WL 4904071, at *11 (ALJ's finding of inconsistency between claimant's subjective complaints and the other evidence of record was found to be proper). As the foregoing analyses have demonstrated, the ALJ properly examined all of the evidence of record before determining that Joshua M.'s subjective complaints were inconsistent. Filing 11-2 at 19–20 (AR 18–19). In the case at hand, when viewing the record in the light most favorable to the ALJ's decision, it is clear that the ALJ's decision is supported by substantial evidence on the record as a whole. Filing 11-2 at 16–26 (AR 15–25); *see Dols*, 931 F.3d at 748 (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

### III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision in Joshua M.'s case. Accordingly,

IT IS ORDERED:

1. Joshua M.'s Motion for an Order Reversing the Commissioner's Decision, Filing 13-1, is denied;

2.  Kijakazi's Motion for an Order Affirming the Commissioner's Decision, <u>Filing 14</u>, is granted;

3.  The Commissioner's decision is affirmed; and

4.  The Court will enter a separate judgment.

Dated this 25th of July, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge